UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
TRAFALGAR POWER, INC. and
CHRISTINE FALLS CORPORATION,

                                        Plaintiffs,

     -v-                                                    5:05-CV-1533

U.S. BANK NATIONAL ASSOCIATION, formerly
known as State Street Bank & Trust Company
of Connecticut,

                                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

HARRIS BEACH PLLC                         PAUL J. YESAWICH, III, ESQ.
Attorneys for Plaintiffs                  LAURA W. SMALLEY, ESQ.
99 Garnsey Road                           DAVID J. EDWARDS, ESQ.
Pittsford, New York 14534

SHIPMAN & GOODWIN LLP                     KATHLEEN M. LaMANNA, ESQ.
Attorneys for Defendant                   MARK K. OSTROWSKI, ESQ.
One Constitution Plaza                    JILL M. O'TOOLE, ESQ.
Hartford, Connecticut 06103               ERIC S. GOLDSTEIN, ESQ.

BOND, SCHOENECK & KING PLLC               BRIAN J. BUTLER, ESQ.
Attorneys for Defendant                   COLIN M. LEONARD, ESQ.
One Lincoln Center
Syracuse, New York 13202


DAVID N. HURD
United States District Judge

### MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

     Plaintiffs Trafalgar Power, Inc. ("TPI") and Christine Falls Corporation ("CFC")

(collectively "plaintiffs" or "Trafalgar") brought this action against defendant U.S. Bank

National Association, formerly known as State Street Bank & Trust Company of Connecticut, ("defendant" or "Bank") claiming breach of fiduciary duty, entitlement to an accounting, negligence, and breach of contract.[1]  Defendant answered and asserted counterclaims for a declaratory judgment for contractual payment and contractual indemnification.

The Bank moved for summary judgment.  Trafalgar opposed and cross-moved for partial summary judgment.  Defendant opposed plaintiff's cross-motion.  The motions were taken on submission without oral argument.

## II. <u>BACKGROUND</u>

The following facts are undisputed unless otherwise noted.  To the extent that plaintiffs' responsive Statement of Material Facts ("SMF") fails to deny defendant's assertions with a specific citation to facts in the record giving rise to a factual issue, defendant's assertions are deemed admitted.  <u>See</u> L.R. 7.1(a)(3).

Trafalgar was a developer of hydroelectric power generating facilities ("power plants"). It obtained initial construction financing for the development of the power plants in upstate New York, but then refinanced the power plant projects with a loan for $22.5 million from Aetna Life Insurance Company ("Aetna") in 1988.  Notes were issued and held by Aetna, and Trafalgar put up as collateral essentially all of its interests in the power plants and the revenue from electricity they generated.  The Bank was named security trustee for the holder of the notes (Aetna).

---

[1]  Trafalgar's other claims for constructive fraud, conversion, aiding and abetting breach of fiduciary duty, and violations of the Federal Trust Indenture Act, 15 U.S.C. §§ 77a–77bbbb, were previously dismissed on February 10, 2009.

The power plants were constructed, and Trafalgar operated and managed them until June 1995.  During the period in which Trafalgar acted as operator and manager of the power plants, it missed principal and interest payments on the loan to Aetna, and was in default as to its obligations to Aetna.

Accordingly, Trafalgar and Aetna negotiated a restructuring of the loan.  As a condition of the restructured financing, Aetna required that Trafalgar retain an outside operator and manager for the power plants.  To that end, Algonquin Power Corporation, Inc. ("APC") began managing the power plants in June 1995.  Trafalgar and APC entered into a Management Agreement on January 15, 1996, defining their roles and obligations as owner and operator/manager, respectively.  See generally Ostrowski Aff. Ex. 2, Dkt. No. 93-4 ("Management Agreement").[2]

Also in order to effectuate the loan restructuring, on January 15, 1996, Trafalgar and the Bank entered into an Amended and Restated Collateral Trust Indenture ("Indenture").  See generally Ostrowski Aff. Ex. 1, Dkt. No. 93-3 ("Indenture").[3]  Aetna purchased two notes for a total of $22.5 million, and forgave the accrued and unpaid interest owed to it by Trafalgar in the amount of approximately $12.5 million.  Trafalgar again pledged as collateral virtually all of its interests in the power plants.  Although the Indenture and the Management Agreement together set forth the parameters for operation of the power plants and repayment of the notes, the Management Agreement was expressly subordinate to the Indenture.  Id. at 15 ¶ 4.31.

---

[2]  Pinpoint citations in the Management Agreement will be to the ECF page number.

[3]  As with the Management Agreement, pinpoint citations will be to the ECF page number.

Following is a general overview of the parties' agreements regarding the power plant operations and the payment on the loan.  Further details regarding the terms of the Indenture and Management Agreement, including specific terms, will be set forth as necessary in the analysis below.  After the overview, the facts leading to the filing of this action will be set forth.

APC was responsible for managing all aspects of the operation of the power plants. This included responsibility for personnel, equipment, and compliance with all applicable laws, as well payment of taxes for payroll and its own income.  APC prepared and provided an Operations and Maintenance Budget ("budget"), as well as revisions to the budget, which the note holders approved.  APC made disbursement requests for payment of operational expenses, which the Bank was authorized to pay so long as the request was consistent with the approved budget.  Moreover, Trafalgar agreed not to make any expenditures of revenue generated by the power plants except in accordance with the budget.

Trafalgar was liable to pay, but APC "shall cause to be paid" sales or use tax on capital improvements and any taxes incurred with respect to costs of operation.  Trafalgar, and not APC, was responsible for payment of all taxes, assessments, and any levies imposed upon it or its property by the government.  Additionally, Trafalgar was required to keep the power plants free from liens.

APC was obliged to prepare and provide certain monthly and annual reports and financial statements to Trafalgar as owner, the Bank as security trustee, and Aetna as note holder.  Further, APC was required to provide Trafalgar and the Bank full access to the power plants to inspect and observe the operations.  However, neither Trafalgar nor the Bank

were permitted to "materially interfere" with APC's lawful activities in the course of such inspections and observations. Id. at 12 ¶ 4.14.

All revenue from the sale of electricity generated by the power plants was deposited directly with the Bank by the purchaser (e.g., National Grid). Those funds were held in trust by the Bank as security for the loan and as well as being disbursed by the Bank to pay operating costs (as delineated by APC in its disbursement requests), management fees to APC, loan payments to Aetna, and other expenses as permitted by the parties' agreements.

From 1996 through 1999 APC submitted thirty-nine disbursement requests, the last of which was paid by the Bank on July 20, 1999. APC also prepared revisions to the budget. Trafalgar received the disbursement requests, as well as the budget and revisions to it.

During the 1997 calendar year affiliates of APC acquired the notes from Aetna, thereby becoming the "note holder(s)" for purposes of the Indenture and Management Agreement. The APC affiliates who became note holders as a result of the acquisition will be referenced as "Algonquin" to differentiate from APC.

Trafalgar filed its corporate income taxes with a group of subsidiaries of Marina Development, Inc. ("Marina"). This group will be referenced as "Trafalgar filing group." The Trafalgar filing group tax return for the 1995 tax year was due on June 15, 1996. James D. Cox ("Cox"), Trafalgar filing group's accountant, cautioned that forgiveness of the approximately $12.5 million debt by Aetna resulted in a federal income tax liability of $283,000. The Trafalgar filing group sought an extension until December 16, 1996, for filing its return. It filed its return on December 16, 1996, reporting only a $35,000 Income tax liability. However, it did not remit the $35,000 income tax.

On July 7, 1997, the United States Internal Revenue Service ("IRS") sent to Trafalgar filing group a Request for Payment of the income tax, penalties, and interest related to the 1995 tax year.  The income taxes remained unpaid.  Consequently, on August 11, 1997, the IRS sent a Final Notice of Intent to Levy and assigned the 1995 income taxes for enforcement action.  Trafalgar did not inform the Bank that its 1995 income taxes were late and remained unpaid.

The Trafalgar filing group 1996 income taxes were due June 15, 1997.  Trafalgar filing group again requested and received a six-month extension.  It filed its return on December 11, 1997, reporting an income tax liability of over $131,000.  However, it did not remit payment for the income taxes due.  Again, Trafalgar failed to inform the Bank that its 1996 income taxes were delinquent and unpaid.  In July 1997 the IRS sent Trafalgar filing group a Request for Payment of the 1996 income taxes.

On December 4, 1998, the IRS informed Trafalgar filing group that it would conduct an audit for the 1996 tax year.  Trafalgar never notified the Bank or APC that the IRS was conducting an audit of its 1996 income tax return.  With regard to the audit, the IRS made several requests to Trafalgar filing group for information and documents.  On June 22, 1999, Cox sent a letter to the IRS stating, in part, "I simply do not understand based on this information why the [IRS] cannot simply levy the State Street Bank account for the taxes that are due.  As you can see from the information, there is a substantial amount of money both received and spent out of this account."  Ostrowski Aff. Ex. 18, Dkt. No. 93-5 at 50.

In late June 1999 APC and the note holders became aware of Trafalgar filing group's 1995 and 1996 income tax delinquencies.  On July 1, 1999, the IRS issued another Notice of Intent to Levy on Trafalgar, and demanded payment of the $197,092.56 owed (1995 and

1996 income taxes plus penalties and interest) within thirty days.  The note holders then sent a letter to Trafalgar notifying it that it would be in default if it failed to cure the income tax deficiencies.  When Trafalgar failed to do so, Algonquin, as note holder, notified Trafalgar it was in default on the loan, so notified the Bank, and directed the Bank to take possession of the operating account and remit it to the note holder.  It further notified the Bank that it had advised Trafalgar it was accelerating payment on the notes.  From the point that the Bank was notified that Trafalgar was in default, it was obligated to act prudently, and exclusively for the benefit of the note holder.  Indenture § 9.1(b).

On August 6, 1999, Trafalgar filed suit against Aetna, Algonquin, and APC and other Algonquin affiliates, alleging that Aetna wrongfully sold the notes to Algonquin.  Litigation ensued.  On November 18, 2010, the United States Court of Appeals for the Second Circuit upheld the grant of summary judgment in favor of the defendants and dismissing Trafalgar's claims.  Christine Falls Corp. v. Algonquin Power Fund, Inc., Nos. 09-4408-cv, 09-4610-cv, 401 Fed. Appx. 584, 587 (2d Cir. 2010) (finding Aetna permissibly sold the notes to Algonquin) (unpublished summary order).[4]  The Bank was not a party to that lawsuit and did not in any way participate in it.

In August 27, 2001, Trafalgar filed for bankruptcy protection.  The bankruptcy court granted Trafalgar's request to use the note holders' cash collateral account in order to

---

[4]  The Second Circuit affirmed the orders of April 12, 2006, 427 F. Supp. 2d 202, and December 19, 2006, (bench decision/summary order) dismissing Trafalgar's claims regarding Aetna's sale of the notes to Algonquin.  It affirmed the order of November 6, 2008, 396 B.R. 584, to the extent that it (1) denied Trafalgar leave to amend its complaint and (2) dismissed the claims for conversion, breach of implied covenant of good faith and fair dealing, negligent performance of a contract for services, breach of contract, Civil RICO, and unjust enrichment brought by Trafalgar via an adversary proceeding.  The Second Circuit vacated and remanded the November 6, 2008, decision to the extent that it dismissed Algonquin's counterclaims against Trafalgar seeking a declaration that Trafalgar defaulted on its obligations as to the notes, therefore entitling Algonquin to take possession of the collateral.  An order on that remand is pending.

continue operations, and in accordance with the terms and conditions of the Indenture and the approved budget.  The bankruptcy court also issued an order permitting Trafalgar to examine the Bank's records.

Trafalgar filed the complaint in this action on December 8, 2005.  It filed an amended complaint asserting new claims surrounding its default on August 13, 2008.

## III.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); <u>Richardson v. New York State Dep't of Correctional Servs.</u>, 180 F.3d 426, 436 (2d Cir. 1999); <u>Lang v. Retirement Living Pub. Co.</u>, 949 F.2d 576, 580 (2d Cir. 1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986); <u>Thompson v. Gjivoje</u>, 896 F.2d 716, 720 (2d Cir. 1990).  Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); <u>Richardson</u>, 180 F.3d at 436; <u>Project Release v. Prevost</u>, 722 F.2d 960, 968 (2d Cir. 1983).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, 106 S. Ct. at 1356.  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.  To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

Moreover, material facts set forth in the movant's statement required by the local rules are deemed admitted unless controverted in the nonmovant's statement in opposition.  L.R. 7.1(a)(3).  Thus, no genuine issue exists as to facts set forth in a movant's 7.1 Statement if the nonmovant fails to put such facts into controversy by a response in opposition to the summary judgment motion.  See id.

## IV. **DISCUSSION**

The Bank argues that it has no fiduciary duty, either as a matter of contract, arising from the Indenture, or as imposed by the common law.  Trafalgar argues to the contrary, that the Bank owes it a fiduciary duty based upon the Indenture, common law, and as an escrow agent.  Additionally, Trafalgar contends that the Bank breached its duty, causing Trafalgar damages.

The Bank further argues that all of the claims against it are barred by the statute of limitations, which cannot be equitably tolled, and it repudiated any duty it had.  Trafalgar again argues to the contrary, that equitable tolling applies and the Bank did not repudiate its duties.

The Bank seeks dismissal of the cause of action for an accounting.  Finally, the Bank argues that laches precludes Trafalgar's claims, while Trafalgar contends that laches is inapplicable.  The parties agree that Connecticut law applies.

### A. Existence of a Fiduciary Duty

Existence (or non-existence) of a fiduciary duty provides the basis for both parties' claims for entitlement to summary relief as to the first cause of action.  The Bank contends that the terms of the Indenture did not create a fiduciary relationship.  Trafalgar does not argue that the Indenture created a fiduciary relationship.   Therefore, defendant is entitled to summary judgment dismissing the first cause of action to the extent it alleges breach of contractual fiduciary duties.  Given that there was no contractual fiduciary duty, if a fiduciary relationship existed, it must have arisen from some context other than from the terms of the Indenture.  See Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 761 A.2d 1268, 1280, 255 Conn. 20, 41 (Conn. 2000) (recognizing that a fiduciary duty may be implied).

"The determination of whether a duty exists between individuals is a question of law." Biller Assocs. v. Peterken, 849 A.2d 847, 851, 269 Conn. 716, 721 (Conn. 2004); Bass ex rel. Bass v. Miss Porter's School, 738 F. Supp. 2d 307, 330 (D. Conn. 2010).  Plaintiffs assert that generally whether a fiduciary duty exists is a question of fact.[5]  In support of this proposition, they cite numerous unpublished lower court cases which, although do state that existence of a duty is a question of fact, see, e.g., Pellegrino Law Firm, P.C. v. Charles M. Fresher, LLC, No CV054007376, 2006 WL 164952 (Conn. Super. Ct. Jan. 4, 2006) (unpublished), are not considered authoritative,[6] although possibly persuasive, but

---

[5]  Even if plaintiffs' proposition is correct, it is appropriate to consider whether a fiduciary duty exists. The issue on a motion for summary judgment is whether a genuine issue of material facts exists.  See Fed. R. Civ. P. 56.  If the Bank meets its burden of establishing that no question of fact exists, and Trafalgar fails to set forth facts to establish that there is a question for trial regarding the existence of a fiduciary duty, that determination can properly be made on this motion.

[6]  For example, in Pellegrino, the court stated:  "the existence of a fiduciary duty is a question of fact" without any citation to authority.  Id. at *1.

nonetheless cannot supersede the statement of the law by the Connecticut Supreme Court in Biller Associates.   "The fact that the existence of a fiduciary duty exists [sic] turns on the facts of the case does not render the question one of fact rather than law." Bass ex rel. Bass, 738 F. Supp. 2d at 330 (citing Biller Assocs., 849 A.2d at 851, 269 Conn. at 721-22). "The Supreme Court of Connecticut has 'specifically refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.'" Fenn v. Yale Univ., 283 F. Supp. 2d 615, 632 (D. Conn. 2003) (quoting Alaimo v. Royer, 448 A.2d 207, 209, 188 Conn. 36, 41 (Conn. 1982)).

        "'[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.'" Biller Assocs., 849 A.2d at 851, 269 Conn. at 723 (emphasis omitted) (quoting Hi-Ho Tower, Inc., 761 A.2d at 1278, 255 Conn. at 38).  Business relationships may not always "implicate the duty of a fiduciary." Id. at 851-52, 269 Conn. at 723.  Where one party is "in a relationship of dependency, or was under a specific duty to act for the benefit" of the other party, a fiduciary relationship exists. Id. at 852, 269 Conn. at 723-24.  However, where "'the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence,'" a fiduciary duty does not exist. Id., 269 Conn. at 724 (quoting Hi-Ho Tower, Inc., 761 A.2d at 1279, 255 Conn. at 39). Moreover, there is a considerable difference between a "relationship between sophisticated business partners in a business venture" and a "relationship involving lay people who are

wholly dependent upon the expertise of a fiduciary." Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP, 912 A.2d 1019, 1035,  281 Conn. 84, 108-09 (Conn. 2007).

In Falls Church Group, Ltd., the court found that a fiduciary relationship existed between the owner of a retirement home, which had "complete knowledge and control" of the home, and residents of the retirement home due to

> the unequal bargaining position, the advanced age of the plaintiffs, [and] the placement of trust and the disclosure of confidential information by the . . . residents.  Indeed, the plaintiffs were elderly, in their 80s and 90s, referred to by  employees of [the owner] as "clients," each of whom was required to complete a confidential data application, which asked them to list assets, income, health conditions or problems, etc., before they entered into a complex contract for what was to be not only their last major investment—one assured to be safe—but their future home and medical care.

Id., 281 Conn. at 109 (internal quotations omitted).  In contrast, the court in Biller Associates found no fiduciary duty existed where there were "sophisticated parties engaged in arm's length negotiations."  849 A.2d at 852, 269 Conn. at 724.  The court found that there was no "unique degree of trust and confidence" where one party "undertook to act primarily for the benefit of the [other]."  Id., 269 Conn. at 725.  In fact, the court noted that the situation was quite the opposite in that both parties "had been hired to act primarily for the benefit of" the non-party who had hired each of them.  Id.

According to Trafalgar, it reposed trust and confidence in the Bank to perform its duties as set forth in the Indenture, creating an implied fiduciary relationship.  However, more than Trafalgar relying upon or trusting the Bank is necessary to constitute a fiduciary relationship.  See PTI Assocs. v. Carolina Int'l Sales Co., No. 3:09-CV-849, 2010 WL 363330, at *4 (D. Conn. Jan. 26, 2010) (stating that a "party's total dependence on the other

does not create a fiduciary duty") (unpublished), clarified on reconsideration on other grounds, 2010 WL 617374 (D. Conn. Feb. 18, 2010).

Trafalgar entered into the Indenture with the Bank as a condition of obtaining the restructured $22.5 million loan from Aetna.  Trafalgar agreed to this condition, and acquiesced to naming the Bank as security trustee.  The Bank held the property Trafalgar put up as collateral for the loan in trust "as security for, or as additional sources of payments of, the Indenture Indebtedness."  Indenture Granting Cl. B at 8.  The collateral was to be held in trust only for the benefit of the note holders.  Id. Granting Cl. C at 8.  Revenue from the electricity generated by the plants was also placed in trust with the Bank in order to pay the operating expenses of the power plants in accordance with an approved budget. Management Agreement § 6.1(a) at 15.  Pursuant to the terms of the Indenture, the Bank disbursed monies from the operating account it held in trust to pay the operating and management expenses of the power plants.  There are no facts in the record indicating that there was any "'unique degree of trust and confidence'" between Trafalgar and the Bank such that the Bank "undertook to act primarily for the benefit of" Trafalgar, thereby creating a fiduciary relationship.  See Hi-Ho Tower, Inc., 761 A.2d at 1279, 255 Conn. at 41 (quoting Konover Dev. Corp. v. Zeller, 635 A.2d 798, 805, 228 Conn. 206, 219 (Conn. 1994) (internal quotation omitted)).  The Bank may have had a contractual obligation to properly disburse operating monies, but there was no fiduciary duty.

The Bank and Trafalgar were both sophisticated businesses that entered into this transaction at arms length.  Both were well-experienced in complex commercial transactions, and were equal in bargaining positions.  The Bank was not in a dominant position that forced Trafalgar to be dependent upon it.  Nor was the Bank under any specific duty to act for

Trafalgar's benefit.  In fact, the terms of the Indenture required the Bank to act for the benefit of the note holders.  See, e.g., Indenture Granting Cl. D at 8; id. § 9.1(b).  The requirement under the Indenture that the Bank act solely for the benefit of the note holders precludes any implication that the Bank was to act for the benefit of Trafalgar.  See Biller Assocs., 849 A.2d at 852, 269 Conn. at 725 (finding that where plaintiff and purported fiduciary were both hired to act for the benefit of defendant, although the purported fiduciary represented that defendant would honor their agreement with plaintiff, the purported fiduciary owed no duty to plaintiff).  Additionally, although the Bank was authorized to disburse funds consistent with the approved budget, Trafalgar itself had the obligation to reconcile actual operating expenses with disbursement of monies from the operating fund according to APC's disbursement requests, and provide a monthly statement to the note holders.  Indenture § 8.3(a) at 53.

Trafalgar's purported reliance on the Bank to safeguard its funds and properly disburse them to APC is insufficient to create a fiduciary relationship out of a business relationship.  See Biller Assocs., 849 A.2d at 853, 269 Conn. at 725 (quoting Hi-Ho Tower, Inc., 761 A.2d at 1280, 255 Conn. at 41, for the proposition that "'[t]he fact that one business person trusts another and relies on [that person] to perform [his obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty'"); PTI Assocs., 2010 WL 363330, at *4 (noting that "[o]ne party's total dependence on the other does not create a fiduciary duty").  Where, as here, the plaintiff may have relied upon the expertise of the defendant, but the defendant did not undertake to act for the benefit of the plaintiff, the business relationship is not transformed into that of a fiduciary.  See Hi-Ho Tower, Inc., 761 A.2d at 1279-80, 255 Conn. at 41-43; PTI Assocs., 2010 WL 363330, at *4.

Thus, while the Bank may have had a contractual obligation to safeguard and properly disburse Trafalgar's operating funds, there was no fiduciary duty in that regard.

The Bank also argues that where, as here, the Indenture explicitly denounced existence of a fiduciary relationship, there can be no common law fiduciary duty.  Trafalgar argues that the terms of the Indenture do not negate the implied fiduciary relationship.  The intent of the parties must be "ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter."  Konover Dev. Corp., 635 A.2d at 811, 228 Conn. at 233 (internal quotation omitted).  Clear and unambiguous terms of a writing are given effect.  Id.  The section of the Indenture titled "The Security Trustee" defines the duties and responsibilities of the Bank, in unambiguous terms confining the Bank's duties to those set forth in the Indenture.  It provides that if there is no default "the Security Trustee undertakes to perform, and shall perform, such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this indenture against the Security Trustee."  Indenture § 9.1(a)(i).  Moreover, in the event of a default, the Indenture clearly and unambiguously holds the Bank as security trustee to "the same degree of care and skill . . . as a prudent man . . . under the circumstances" in performing its duties under the Indenture.  Id. § 9.1(b).  Therefore, the Bank's duties were clearly agreed upon as set forth in the Indenture, and no fiduciary duty beyond those terms can be implied.  See Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988) (stating it is well-established that "the duties of an indenture trustee are strictly defined and limited to the terms of the indenture"); Meckel v. Cont'l Res. Co., 758 F.2d 811, 816 (2d. Cir. 1985) (recognizing that common-law duties

imposed upon ordinary trustees are not imposed upon indenture trustees; rather, the indenture trustee's "duties and obligations are exclusively defined by the terms of the indenture agreement").

Trafalgar makes a final argument that the Bank, as escrow agent, owed it a fiduciary duty.  Trafalgar points to sections 5.3(b)(i) and 9.1(a)(ii) of the Indenture as effectively establishing an escrow agency.  According to the Bank, the Indenture does not expressly create an escrow agency, therefore, according to its terms, as a matter of contract law, one cannot be implied.

Section 5.3(b)(i) provides that the Bank make disbursements from the operating account pursuant to a disbursement request from APC, as follows:

> (b)  Disbursements.  Each month, commencing on March 10,1996, the Security Trustee shall disburse from the Operational Fund all amounts due to the Persons or the Funds specified in the following items (i) through (vii), inclusive, as and when said amounts shall become due during such month:
>
> > (i)  on the tenth day of each month, upon submission by the Manager of a disbursement request in the form of Exhibit A attached hereto (the "Disbursement Request"), the Monthly Operation and Maintenance Amount for such month to the Manager,

Indenture § 5.3(b)(i) at 35.  It is unambiguous that this section does not expressly create an escrow agency.  Section 9.1(a)(ii) sets forth certain duties of the Bank when no event of default has occurred, pertaining to disbursements, as follows:

> (ii)  in the absence of bad faith on its part, the Security Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Security Trustee and conforming to the requirements of this Indenture or the other Financing Documents; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Security Trustee, the Security Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

Id. § 9.1(a)(ii) at 61.  Again, the language of this section does not expressly create an escrow

agency.  Further, the previous subsection provides that the Bank has only those duties

specifically expressed in the Indenture, as follows:

> (i)  the Security Trustee undertakes to perform, and shall perform, such duties and <u>only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Security Trustee</u>.

Id. § 9.1(a)(i) at 61 (emphasis added).  Thus, under the unambiguous terms of the Indenture

no escrow agency can be implied, because any such duty is not specifically set forth in the

Indenture.  Accordingly, Trafalgar's argument that the Bank, as escrow agent, owes Trafalgar

a fiduciary duty fails.

The Bank owed no fiduciary duty to Trafalgar.  Because no fiduciary duty existed,

consideration of Trafalgar's arguments regarding the Bank's purported breach of such duty is

unnecessary.  Therefore, the Bank is entitled to summary judgment dismissing the first cause

of action for breach of fiduciary.

### B.  Statute of Limitations

The Bank argues that the breach of fiduciary duty[7] and breach of contract claims

against it are barred by the statutes of limitations, and that the statutes of limitations were not

tolled.  Trafalgar contends that its claims were not time-barred, the statutes of limitations

were tolled, and further that its causes of action have continued to accrue since the first

breaches in September 1999 and for the continuing breaches in ensuing years.

---

[7]  Technically the statute of limitations argument is moot since it has been determined that no fiduciary duty existed.  However, a statute of limitations analysis will be conducted for thoroughness.

The parties agree that the statute of limitations for breach of fiduciary duty claims is three years and for the breach of contract claims is six years.

### 1. Fiduciary Duty Claim

In a breach of fiduciary duty tort action the statute begins to run when the injury occurs rather than at the time of discovery.  Steele v. Anderson, No. 03-CV-1251, 2004 WL 45527, at *1 (N.D.N.Y. Jan. 8, 2004) (McAvoy, J.); Ackerman v. Price Waterhouse, 644 N.E.2d 1009, 1011, 84 N.Y.2d 535, 541 (N.Y. 1994) (accounting malpractice tort action).  The limitations period commences when "'the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated.'"  Steele, 2004 WL 45527, at *1 (quoting Westchester Religious Inst. v. Kamerman, 262 A.D.2d 131, 131 (N.Y. App. Div. 1st Dep't 1999)).  That is, "when all the facts necessary to the cause of action have occurred and an injured party can obtain relief in court," the cause of action has accrued.  Ackerman, 644 N.E.2d at 1012, 84 N.Y. 2d at 541.

Trafalgar alleges that the Bank breached its fiduciary duties related to disbursement of funds from the operating account and otherwise failing to meet its obligations to Trafalgar under the Indenture.  Am. Compl. ¶ 98, Dkt. No. 19.  The Bank made thirty-nine disbursements from the operating account between March 1996 and July 1999 based upon disbursement requests submitted by APC and in accordance with revisions to the budget.  Pltf.'s Resp. SMF ¶ 26, Dkt. No. 96-4.  After July 1999, the Bank made no further disbursements pursuant to formal disbursement requests by APC.  Deft.'s Resp. SMF ¶ 30, Dkt. No. 114.  After July 1999, APC made no further formal disbursement requests to the

Bank.[8]  Id.  On August 5, 1999, APC notified the Bank that Trafalgar was in default and

directed the Bank to take possession of the operating fund and forward it APC.[9]   The last

possible breach of purported duty related to disbursement requests by APC and fulfilled by

the Bank was July 1999.  Any claim for breach of such purported duty must have accrued in

July 1999, beginning running of the statute of limitations.  As such claims accrued in July

1999, any claims brought more than three years thereafter, after July 2002, would be time-

barred.  The breach of fiduciary claim herein was brought on December 8, 2005, Compl. ¶¶

20–23, Dkt. No. 1, clearly after the limitations period had run.

Trafalgar contends that the Bank did not repudiate its purported fiduciary duty at least

until February 2008, when it last made demands for payments for its services.  Trafalgar's

contention fails on two grounds.

First, when the Bank stopped making disbursements pursuant to formal APC

disbursement requests, after July 1999, it was no longer following the dictates of the

Indenture, clearly repudiating any obligations thereunder.[10]  That it thereafter continued to

make disbursements to APC for operating expenses and management fees, then resumed

acting as security trustee for the power plants at the direction of and under the auspices of

---

[8]  The July 1999 point in time where the Bank stopped making disbursements pursuant to APC disbursement requests, and APC stopped submitting such requests, is not arbitrary.  Rather, it derives from the July 1, 1999, IRS Notice of Intent to Levy served upon Trafalgar triggering an Event of Default under the Indenture and failure to cure the default. Meanwhile, in 1997 Algonquin had purchased the notes from Aetna. Because Algonquin (not Aetna) was the note holder, when the default occurred the obligations the Bank had under the Indenture to protect the collateral (operating fund and physical plants, as well as Trafalgar stock) ran to Algonquin.

[9]  Note that it was the next day, August 6, 1999, that Trafalgar filed suit alleging that the sale of the notes by Aetna to Algonquin was unlawful.

[10]  Starting in August 1999 the Bank made payments to APC for operating expenses and management fees, albeit without disbursement requests.  Otherwise, the disbursements seemingly were made pursuant to the requirements of the Indenture.

the Bankruptcy Court, does not negate that repudiation.[11]   That 1999 repudiation also was

not negated by the Bank submitting, at least until 2008, proofs of claim to the Bankruptcy

Court for payment of its services and expenses as security trustee of the operating funds of

the power plants and other collateral that Trafalgar used to secure its loans.

Second, the Bank has set forth evidence that Arthur H. Steckler ("Steckler"), President

of Trafalgar and sole shareholder of its corporate owner, recognized that the Bank had

repudiated any obligation it had to Trafalgar under the Indenture.  See generally, Pltf.'s Resp.

SMF ¶¶ 81–85; Deft.'s Resp. SMF ¶¶ 83–85.   For example, Steckler's testimony at

deposition indicated that as of September 1999 he no longer placed trust in the Bank, and he

felt the Bank had breached its fiduciary duty to Trafalgar.  Steckler sent the Bank a letter on

September 14, 1999, threatening to sue because it was breaching its fiduciary duties by

following APC's and/or Algonquin's directives regarding certain collateral.  Further, Cox,

Trafalgar tax filing group's accountant, never spoke to his contact at the Bank after about

June 1999.  Pltf.'s Resp. SMF ¶ 86.  Despite its assertions to the contrary, Trafalgar has not

submitted evidence creating an issue of fact regarding whether the Bank repudiated any

purported fiduciary duty at some point after, rather than no later than, early August 1999.

---

[11]   Trafalgar also argues that each time after July 1999, through at least December 2002, that the
Bank made disbursements from the operating account to APC it was breaching its obligations under the
Indenture.  However, after Algonquin's demand that the Bank take possession of the operating account and
forward it to the note holders (due to Trafalgar defaulting on the terms of the Indenture by failing to pay
income taxes when due), it is clear that the Bank was acting in its role as security trustee to protect the
collateral assets for the benefit of the note holder, rather than as a (purported) fiduciary to Trafalgar.

In fact, this illustrates the determination just made that no fiduciary duty existed.  The purpose of the
Indenture was to secure, for the benefit of the note holders, the payment of Trafalgar's loans, and a security
trustee was needed to accomplish that.  See Indenture, Agreement ¶, at 7.  The purpose was not to protect
Trafalgar, the borrower, in any way.  See generally, Indenture.

Moreover, these undisputed facts belie any claim that the Bank continued to improperly perform its purported fiduciary duties thereby tolling the statute of limitations.

Any breach of purported fiduciary duty by the Bank occurred no later than July 1999, and the Bank repudiated such purported duty no later than August 1999. Accordingly, Trafalgar's breach of fiduciary duty claim, filed in December 2005, is barred by the three-year statute of limitations.

### 2. Breach of Contract Claim

The Fourth Cause of Action, for breach of contract, alleges that the Bank failed to perform its obligations under the Indenture. The obligations Trafalgar points to are related to disbursements, allegedly not in compliance with the budget and other terms of the Indenture. As set forth above, the last disbursement the Bank made to APC pursuant to a formal disbursement request was in July 1999. Thus, any claim for breach of contract related to improperly making such disbursement accrued in July 1999. The six-year statute of limitations ran in July 2005. Trafalgar's claim, filed in December 2005, is barred by the statute of limitations. Any argument that continuing breaches tolled that statute of limitations fails for the same reasons set forth in the breach of fiduciary duty claim analysis. Trafalgar has not set forth any other actions by the Bank that allegedly constitute a breach of contract. Therefore, the Bank is entitled to summary judgment dismissing the breach of contract claim.

### C. Action for an Accounting

An action for an accounting is a remedy, rather than a "substantive cause[] of action upon which the complaint is predicated." Macomber v. Travelers Prop. & Casualty Corp., 804 A.2d 180, 185 n.3, 261 Conn. 620, 623 n.3 (Conn. 2002). "'An action for an accounting calls for the application of equitable principles.'" Mankert v. Elmatco Prods., Inc., 854 A.2d

766, 767, 84 Conn. App. 456, 459 (Conn. App. 2004) (quoting <u>Travis v. St. John</u>, 404 A.2d

885, 888, 176 Conn. 69, 74 (Conn. 1978)).  "'To support an action of accounting, one of

several conditions must exist.  There must be fiduciary relationship, or the existence of a

mutual and/or complicated accounts, or a need of discovery, or some other special ground of

equitable jurisdiction such as fraud.'"  <u>Id</u>. at 769, 84 Conn. App. at 460 (emphasis omitted)

(quoting <u>C&S Research Corp. v. Holton Co.</u>, 422 A.2d 331, 332, 36 Conn. Supp. 619, 621

(Conn. Super. Ct. 1980)).

Trafalgar's substantive causes of action, for breach of fiduciary duty and breach of

contract, are being dismissed, therefore what it has styled as a "cause of action" for an

accounting must also be dismissed.  In other words, without a viable substantive claim there

can be no remedy.  Trafalgar argues that under the February 10, 2009, decision in this case

and Connecticut law, an accounting is an independent cause of action.

The February 10, 2009, decision declined to dismiss the accounting cause of action,

stating:  "A cause of action for an accounting, whether a cause of action in its own right or

simply as a remedy, likewise cannot be dismissed at the pleading stage because it is based

upon a fiduciary duty, which is alleged."  Yesawich Aff. Ex. 132 at 21, Dkt. No. 102-4 at 91.

This statement recognizes that, on the motion to dismiss, the parties were in contention

regarding whether an accounting was a substantive claim or a remedy.  Because the breach

of fiduciary duty claim survived the Bank's motion to dismiss, what Trafalgar styled as an

action for an accounting likewise was not dismissed.  This in no way found that an

accounting was a cause of action in its own right.

Similarly, the Connecticut law cited by Trafalgar does not support that an accounting is

a substantive cause of action.  Trafalgar first quotes <u>Mankert</u>, 854 A.2d 76 at 769, 84 Conn.

App. at 460, adding emphasis as follows:  ""To support an <u>action</u> of accounting, one of

several conditions must exist. . . ."  While the <u>Mankert</u> Court did refer to an accounting as an

"action," such a reference from a lower appellate court cannot supplant the law as stated by

the Supreme Court of Connecticut.  <u>See</u> <u>Macomber</u>, 804 A.2d at 185 n.3, 261 Conn. at 623

n.3 (stating that actions for accounting are not substantive claims, but rather are requested

remedies).

     Trafalgar also cites <u>Zuch v. Conn. Bank & Trust Co.</u>, 500 A.2d 565, 567, 5 Conn. App.

457, 460 (Conn. App. Ct. 1985), for the statement that "[t]he basis for a right to an

accounting is supported by an allegation that a fiduciary relationship exists. . . ."  The

complaint in <u>Zuch</u> sought an accounting pursuant to a Connecticut statute regarding trusts.

<u>Id</u>. at 566, 5 Conn. App. at 457.  The court found that the complaint stated a claim because a

fiduciary relationship was alleged, which was all that was required to obtain the statutory

accounting plaintiff sought.  <u>Id</u>. at 567, 5 Conn. App. at 460.  Trafalgar neglects to continue

quoting from <u>Zuch</u>, which would have illustrated that court's understanding that an accounting

is a remedy.  The <u>Zuch</u> Court stated:

> The <u>remedy</u> of an accounting . . . .  Appropriate factual allegations for an
> accounting must be shown before a party can invoke this <u>remedy</u>. . . .  While
> there are cases which hold otherwise, the vast weight of authority in this
> jurisdiction requires the allegation of a demand and refusal before a party may
> successfully invoke the <u>remedy</u> of an accounting.  Such a conclusion is in
> accord not only with the traditional understanding of an accounting as a <u>remedy</u>
> . . . .

<u>Id</u>. at 567-68, 5 Conn. App. at 460-62.

     Next Trafalgar cites <u>Frank v. LoVetere</u>, 363 F. Supp. 2d 327, 345 (D. Conn. 2005), as

noting that the request for an accounting <u>could</u> be read as a remedy.  What the decision

actually stated was that at "oral argument plaintiff agreed that an accounting could be

considered a remedy rather than a claim, and consented to dismissal" of the separate accounting cause of action.  Id.  Trafalgar improperly extrapolates from this that the Frank Court did not eliminate an accounting as a cause of action.  The Frank Court's statement cannot be read in any way as suggesting that an accounting can be a substantive cause of action.  See id.  Moreover, the Frank Court was restating plaintiff's assertion, rather than making a finding, or even a statement, of its own.  Trafalgar's arguments that an accounting is an independent cause of action are not well-founded.

Because both substantive causes of action are being dismissed, Trafalgar's request for the remedy of an accounting ("Second Cause of Action") must also be dismissed.

## V. CONCLUSION

No fiduciary duty existed between the Bank and Trafalgar.  Even if a fiduciary duty existed, any claim for breach of that duty is barred by the statute of limitations.  The breach of contract claim is also barred by the statute of limitations.  An accounting is a remedy, not a stand-alone cause of action.  With dismissal of the substantive breach of fiduciary duty and breach of contract claims, the Bank is entitled to summary judgment dismissing the action for an accounting.

Given these dispositions, the Bank's arguments regarding lack of damages and laches are moot and need not be considered.  Similarly, Trafalgar's cross-motion for partial summary judgment is moot and must be denied.

The Bank's counterclaims remain unresolved.  Trafalgar did not seek summary judgment dismissing these claims as part of its cross-motion, and the dispositive motion deadline has expired.  However, the first counterclaim for declaratory judgment seeking entitlement to fees and expenses incurred in meeting the terms of the Indenture is being

handled through the Bankruptcy Court.  The second counterclaim for contractual indemnification is moot given the above resolution of Trafalgar's claims.  Therefore, the counterclaims will be dismissed <u>sua sponte</u>.

Accordingly, it is

ORDERED that

1.  The defendant's motion for summary judgment is GRANTED;

2.  The plaintiffs' cross-motion for partial summary judgment is DENIED;

3.  The defendant's counterclaims are DISMISSED; and

4.  The Complaint is DISMISSED in its entirety.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  February 21, 2012
          Utica, New York.